**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PEOPLE CENTER, INC., d/b/a RIPPLING, <br><br> *Plaintiff,* <br><br> v. <br><br> ANYSOURCE, INC., d/b/a RUNLAYER, <br><br> *Defendant.* | Case No. <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff People Center, Inc., d/b/a Rippling ("Rippling" or "Plaintiff"), by its undersigned attorneys, for its Complaint against Defendant Anysource, Inc., d/b/a Runlayer ("Runlayer" or "Defendant") alleges as follows:

**NATURE OF THIS ACTION**

1.      This is an action for patent infringement under the patent laws of the United States, 35 U.S.C. § 100 *et. seq*.

2.      Runlayer infringes at least U.S. Patent Nos. 11,435,994 (the "'994 patent"), 12,032,940 (the "'940 patent"), and 11,789,941 (the "'941 patent"). These are referred to collectively as the "Asserted Patents."

**THE PARTIES**

3.      Plaintiff Rippling is a corporation organized under the laws of the State of Delaware with its principal place of business located at 430 California Street, 11th Floor, San Francisco, California 94104. Rippling is a successful, late-stage software company that offers a global workforce management platform to enable businesses to manage core internal workflows— including human resources, IT, and finance—through a unified suite of cloud-based applications

1

that are built on a single software platform. Rippling's customers are business enterprises ranging from small businesses to larger, enterprise-level customers. Since its founding in 2016, Rippling has been a leader in this space, now serving tens of thousands of customers around the world.

4.      On information and belief, Runlayer is a corporation organized under the laws of the State of Delaware with its principal place of business located at 31 Bond Street, New York, New York 10012. Runlayer offers a platform in connection with the deployment and use of AI agents in enterprise applications.

## JURISDICTION AND VENUE

5.      The Court has subject-matter jurisdiction over Rippling's patent-infringement claims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Runlayer at least because Runlayer is incorporated in this District.

7.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1400(b) at least because Runlayer is a resident and corporate citizen of this District.

## BACKGROUND

8.      Rippling has been built on a culture of innovation. Before Rippling came along, businesses were forced to use cumbersome workforce-management solutions that were discrete and use-specific—with no overarching, unifying structure. The result was inaccuracy, delays, and inefficiency. Rippling was founded in 2016, and now employs 6,700 people in the United States and abroad, to tackle these (and other) problems head on. Rippling began with a focus on core human-capital management-software solutions (like human resources, payroll, and benefits), before expanding into a full suite of enterprise software tools, including information technology, spend management, and employer-of-record and global-contractor workforce management. Over the course of a decade, Rippling has raised over $2 billion to develop, improve, and deploy its

2

platform. The result has been Rippling's over 20 best-in-class, natively-built, and technology-first solutions directed to bringing down the silos that formerly characterized enterprise software and revolutionizing the technology relied on by businesses in the process. More than 30,000 businesses now run on Rippling, ranging from small businesses to larger, enterprise-level customers, and across numerous economic sectors, such as construction, financial services, and healthcare.

9.      To protect this innovative technology, Rippling has invested substantial time and resources. It has built a vast world-wide patent portfolio, including 39 U.S. patents and counting. These patents include the '994 patent and '940 patent, which are directed to computer-implemented methods, software, and computer systems for integrating third-party applications and data. They also include the '941 patent, which is directed to methods, software, and computer systems relating to automation using triggers tied to organizational data.

10.      Rippling's patented technology is critically acclaimed, having won countless accolades for its innovations. For example, Rippling has consistently risen on Forbes' "Cloud 100" list since 2022, has placed on CNBC's "Disruptor 50" list for three of the past four years, and was recognized by G2 as the Best HR Software Product in 2025. *See* Exhibit 1.[1] And it has been consistently rated as one of America's Best Startup Employers. *Id*.

---

[1] Rippling – Company Overview & News, Forbes (Mar. 3, 2026), https://www.forbes.com/companies/rippling/?list=cloud100; *Users have named Rippling the #1 HR Product on G2*, Rippling (June 29, 2025), https://www.rippling.com/blog/g2-best-hr-software; *2026 CNBC Disruptor 50: See the full list of companies and rankings and a new leader in the AI race*, CNBC (May 19, 2026), https://www.cnbc.com/2026/05/19/2026-cnbc-disruptor-50-rankings-full-list-companies.html; *2025 CNBC Disruptor 50: See the full list of companies leading new era of AI breakthroughs and riches*, CNBC (June 10, 2025), https://www.cnbc.com/2025/06/10/2025-cnbc-disruptor-50-see-the-full-list-of-companies.html; *These are the 2023 CNBC Disruptor 50 companies*, CNBC (May 9, 2023), https://www.cnbc.com/2023/05/09/these-are-the-2023-cnbc-disruptor-50-companies.html.

11.    Rippling's innovations remain as relevant today as they ever were. Indeed, in a world where artificial intelligence (AI) agents are increasingly deployed by businesses to perform data analysis and other tasks, Rippling's innovations have particular resonance. For example, Rippling's patented permissions model—a core component of its patented platform—plays a critical role in modern AI systems. In today's world where AI agents can autonomously access systems and data with little user involvement or oversight, the risk of accidental data access is particularly elevated. Rippling's patented permissions model allows for the centralization of fine-grained permissions on a user-by-user basis, while also allowing for the permissions model to operate dynamically on an organizational or group level—Rippling's "supergroups"—resulting in an AI agent or user with access to just the data they need, without anything more. *See* https://www.rippling.com/platform/permissions (excerpted below) (Exhibit 12). This centralization of the permissions model has gained an even more important role as today's AI systems gain access to more and more systems with separate means of authentication and their own disparate permissions models. In other words, the innovations undergirding Rippling's patented platform provide the technological underpinnings to ensure that AI agents can be effectively set-up, controlled, and relied upon.



Excerpt from https://www.rippling.com/platform/permissions (Exhibit 12).

12.    Rather than respect Rippling's innovations, Runlayer is now offering a platform that infringes Rippling's patents, steals its intellectual property, and drafts off of the substantial time and resources Rippling spent developing this technology over the past decade. For example, Runlayer's platform enables third-party application integration by brokering calls between an organization's AI agents and separate third-party applications using MCP connectors and syncing organizational data. It does this all while ensuring granular permissions on each of the MCP tool calls. And it relies on triggers that are evaluated based on organizational data. Detailed claim charts laying out Runlayer's infringing conduct are attached as Exhibits 2–4.

13.    One need look no further than Runlayer's marketing to see the striking similarity between their approach to policy implementation and Rippling's own approach. For example, as shown below, Runlayer explains how it delineates between "User," "Group," "Role," "Attributes," etc. when applying a policy.

**Applies To** (Who gets access):

- **User**: One or more individual employees by email/ID
- **Group**: One or more teams synced from your SSO (Engineering, Marketing, etc.)
- **Role**: One or more job functions or custom roles
- **Agent Account**: One or more machine-to-machine identities (see **Agent Accounts**)
- **Attributes**: Match users by identity attributes (e.g., department, job title)
- **Everyone**: Wildcard principal that matches all subjects, including users and agent accounts (typically used in global deny policies)

https://docs.runlayer.com/platform-policies (Exhibit 13).

This is the same approach Rippling identifies on its own website. Specifically, Rippling explains that under its own policies, "[s]cope is the people whose data a permission profile has access to. It could be a reporting line or an entire department."



https://www.rippling.com/platform/permissions (Exhibit 12).

Rippling's policy, similar to Runlayer's "attributes," can also be applied based on "supergroups," which are "dynamic membership lists built using attributes like level or location. As an employee's attributes change, their permissions update—sharing data securely and efficiently." Id. (emphasis added).



Excerpt from https://www.rippling.com/platform/permissions (Exhibit 12).

14. On information and belief, Runlayer is using the inventions claimed by the Asserted Patents to compete directly with Rippling, causing actual damages in the form of lost sales, lost customers, and price erosion. Runlayer's conduct is not ordinary competition—it is an attempt to take for itself the benefit of innovations that Rippling invested enormous resources and countless hours to develop, refine, and protect. Having built its platform through years of work and investment, Rippling should not be forced to compete in the marketplace against its own patented technology. Runlayer must pay for the damage it is causing Rippling and must be permanently enjoined from its infringing conduct. Rippling will not sit idly by while Runlayer free rides on Rippling's technology, Rippling's investment, and the platform Rippling spent years building.

## THE PATENTS IN SUIT

### A. U.S. Patent No. 11,435,994 and U.S. Patent No. 12,032,940

15. On September 6, 2022, the United States Patent and Trademark Office lawfully issued the '994 patent. The '994 patent is duly assigned to Rippling, which is the assignee of all right, title, and interest in and to the '994 patent and possesses the exclusive right of recovery for past, present, and future infringement. Each and every claim of the '994 patent is valid and enforceable. A true and correct copy of the '994 patent is attached hereto as Exhibit 5.

16. On July 9, 2024, the United States Patent and Trademark Office lawfully issued the '940 patent. The '940 patent is a continuation of, and shares a common specification with, the '994 patent. The '940 patent is duly assigned to Rippling, which is the assignee of all right, title, and interest in and to the '940 patent and possesses the exclusive right of recovery for past, present, and future infringement. Each and every claim of the '940 patent is valid and enforceable. A true and correct copy of the '940 patent is attached hereto as Exhibit 6.

17. The '940 patent and the '994 patent tackle a similar problem. At the time of the invention, organizations faced substantial difficulties caused by adopting a variety of different

7

enterprise software, which were not integrated with one another. As the specifications explain, this resulted in siloed data and software systems that required "endless manual updates and numerous, bespoke software integrations" to avoid inconsistent and inaccurate results:

> Organizations use different types of software applications and computing systems to manage processes and information across an enterprise. Generally, each different application and computing system provides specialized features, functionality, and operations directed toward a specific solution. However, different applications and systems usually operate in isolation without communicating with one another and maintain their own separate sets of organizational information. As a result, organizational information often remains siloed and becomes inconsistent and inaccurate when one or more changes are not reflected across different applications and systems. Further, endless manual updates and numerous, bespoke software integrations usually are required to maintain accuracy and consistency of organizational information and to support organizational processes across various applications and systems. Therefore, a need exists for improved integration and synchronization involving various third-party applications and systems.

'994 patent, 1:15–33; '940 patent, 1:23–41.

18.     Some companies tried to tackle this problem by building "expensive, proprietary integration applications" to integrate data. '994 patent, 3:49–56; '940 patent, 3:58–65. But that required regular maintenance and was subject to breaking down when data was tweaked, especially by third parties. *Id*. By a similar token, new data could not be easily assimilated into these applications. Others were left to the mercy of "delays, inconsistencies, and errors" caused by the state of affairs. '994 patent, 3:56–63; '940 patent, 3:65–4:5. This was a unique challenge, unlike those faced by enterprises before, tied to the expanded role that enterprise software has come to play.

19.     The '994 patent and the '940 patent provide unique, specific solutions to this problem by enabling third-party application integration with an organization's system. As to the '994 patent, it claims specific ways to integrate organizational data with third-party application data, including the use of rules and access permissions. *See* '994 patent, 33:19–36:52. The '940 patent addresses the other side of integration, claiming specific ways to integrate third-party

8

application data into organizational data, including by using rules associated with access rights and permissions. *See* '940 patent, 33:33–36:50. These claimed techniques embody "a rigorous computerized process that provides high-throughput, resilient, and rapid synchronization of organizational data across distributed applications and computing systems." '994 patent, 4:26–32; '940 patent, 4:35–41.

20.    These claimed inventions resulted in specific improvements to the technology used in the field. For example, the claimed techniques facilitate "integration and synchronization of organizational data across a variety of applications and systems . . . more efficiently and with fewer computing resources" than "would otherwise be wasted by maintaining custom, proprietary, and/or manual processes." '994 patent, 4:16–26; '940 patent, 4:25–35. This includes using "less processing power, less memory usage, [and] less power consumption" than conventional techniques. *Id*.

### B.    U.S. Patent No. 11,789,941

21.    On October 17, 2023, the United States Patent and Trademark Office lawfully issued the '941 patent. The '941 patent is duly assigned to Rippling, which is the assignee of all right, title, and interest in and to the '941 patent and possesses the exclusive right of recovery for past, present, and future infringement. Each and every claim of the '941 patent is valid and enforceable. A true and correct copy of the '941 patent is attached hereto as Exhibit 7.

22.    The '941 patent, like the '940 patent and the '994 patent, addresses a similar, but distinct problem. As the specification of the '941 patent explains, in a computing environment where "organizational data is generated, modified, and utilized separately across various different types of third-party applications and computer systems," "organizational data and associated processes become out of sync when not updated consistently." '941 patent, 5:11–23. The existing solutions relied on "continuous manual processing of organizational data, coordinating and

9

ensuring compatibility between changing configurations across each of multiple different third-party applications and computer systems" or creating "expensive, proprietary integrations across various third-party applications and computer systems that must be maintained and updated." *Id*., 5:23–33. Automation was limited due to the disparate data structures used to store data associated with third-party applications; for example, database triggers were "limited to operations performed on objects within a database" and did not "support various types of operations associated with maintaining an enterprise system of record integrated with multiple, different third-party systems and applications." *Id*., 1:40–45.

23.     The '941 patent solves these, and other, technical problems by providing a computer system, computer-implemented method, and software based upon a trigger that supports inter-application integration. The trigger includes "conditions for activation of the trigger," including a "query expression," and a "set of one or more operations," based on "a custom query language supported by the application," to be executed when the trigger is activated. *Id.*, 48:41–52:26. The conditions are evaluated using specific claimed techniques, such as by traversing a data structure to return a data object of the organizational data as a response to the query expression. *Id*.

**COUNT I:**

**INFRINGEMENT OF U.S. PATENT NO. 11,435,994**

24.     Rippling re-alleges and incorporates by references Paragraphs 1–23 above, as if fully set forth herein.

25.     Claim 1 of the '994 patent recites:

1. A computer-implemented method for performing third-party application integration, comprising:

>    obtaining, by one or more processors, third-party application data associated with a third-party application that is separate from a computing

10

system that comprises organizational data of an organization, wherein the computer system maintains the organizational data as data of record for the organization in view of respective third-party application data received from each of a plurality of third-party applications, and wherein the organization data acts as a centralized system of record for organizational management processes of the organization;

determining, by the one or more processors, whether to obtain other third-party application data associated with a different third-party application that is separate from the computing system and separate from the third-party application;

generating, by the one or more processors, information associated with the organizational data for each of a plurality of other third-party applications separate from the computing system and separate from the third-party application;

providing, by the one or more processors, the generated information to each of the other third-party applications;

analyzing, by the one or more processors, the third-party application data based on one or more rules associated with the computing system and integration information for integrating the third-party application with the organizational data of the organization, wherein the one or more rules associated with the computing system are determined based on analyzing one or more data structures associated with the organizational data, wherein at least one of the data structures is an object graph data structure comprising a plurality of entities associated with the organizational data, and wherein the organizational data includes organizational structure data and the organization structure data indicate a first group of employees have a certain set of permissions relative to a particular group of devices;

processing, by the one or more processors, the third-party application data based on the integration information associated with the third-party application and the organizational structure data;

performing, by the one or more processors, one or more operations associated with the organizational data based on processing the third-party application data; and

providing, by the one or more processors, information associated with the organizational data to one or more third-party applications that are separate from the computing system based on processing the third-party application data.

26.     Runlayer has directly infringed, continues to infringe, and has induced or contributed to the infringement of at least claim 1 of the '994 patent by making, using, selling, and

11

offering for sale, without authority or license, its Runlayer platform. Runlayer is liable for direct infringement, either literally or under the doctrine of equivalents, of the '994 patent pursuant to 35 U.S.C. § 271(a). All steps of at least claim 1 are performed by or attributable to Runlayer. On information and belief, to the extent that Runlayer does not perform any step of the '994 patent, Runlayer directs or controls the performance of its customers' actions through contractual relations or agency principles. On information and belief, Runlayer conditions its customers' participation and benefit of its platform upon performance of one or more claim elements, and establishes the manner of such performance.

27.     Runlayer also actively, knowingly, and intentionally induces infringement of at least claim 1 of the '994 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the Runlayer platform or components of that platform, such as by providing extensive documentation to encourage Runlayer's adoption, *see generally* Exhibit 8,[2] and by publicly promoting and advertises its platform, on its website, on LinkedIn, and elsewhere. *See* Exhibits 9,[3] 10.[4]

28.     Runlayer further contributes to the infringement of at least claim 1 of the '994 patent under 35 U.S.C. § 271(c) by offering to sell and selling components of the Runlayer platform, or a material or apparatus for use in practicing a process claimed in the '994 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially

---

[2] https://docs.runlayer.com/.

[3] https://www.linkedin.com/posts/runlayer_runlayer-dbt-labs-full-substack-post-activity-7480995881832574977-kusj?utm_source=share&utm_medium=member_desktop&rcm=ACoAAB12j8YBOGg0rJapN_5jcKT3IXW3VRpLcUo.

[4] https://www.runlayer.com/about.

adapted for use in an infringement of the '994 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

29.    On information and belief, and based on Runlayer's public documentation, Runlayer meets each and every limitation of the '994 patent's claim 1. *See* Exhibit 2.

30.    It is also expected that discovery will likely reveal additional evidentiary support that Runlayer performs at least the above limitations of the '994 patent.

31.    On information and belief, and at least as of August 9, 2026, Runlayer has known or should have known (i) about the '994 patent, (ii) that Runlayer's actions constituted and continue to constitute infringement of the '994 patent, and (iii) that all claims of the '994 patent are valid and enforceable. *See* Exhibit 11, Aug. 9, 2026 Notice Email to Runlayer.

32.    Runlayer cannot reasonably or subjectively believe that its actions do not constitute infringement of the '994 patent. Nor could Runlayer reasonably or subjectively believe that any claims are invalid. Despite that knowledge and subjective belief, Runlayer's actions are egregious and beyond typical infringement. Runlayer thus willfully infringes the '994 patent.

33.    By its actions, Runlayer's infringement of the '994 patent has irreparably harmed Rippling. Unless Runlayer's infringing acts are enjoined by this Court, Rippling will continue to suffer additional irreparable injury. Rippling has no adequate remedy at law.

34.    By its actions, Runlayer's infringement of the '994 patent has damaged, and continues to damage, Rippling in an amount yet to be determined, of at least a reasonable royalty and/or lost profits that Rippling would have made but for Runlayer's infringing acts.

**COUNT II:**

**INFRINGEMENT OF U.S. PATENT NO. 12,032,940**

35.    Rippling realleges and incorporates by references Paragraphs 1–34 above, as if fully set forth herein.

36.     Claim 1 of the '940 patent recites:

1. A computer-implemented method for performing third-party application integration, comprising:

> obtaining, by one or more processors, third-party application data associated with a third-party application that is separate from a computing system that comprises organizational data of an organization, wherein the computer system maintains the organizational data as a centralized system of record for the organization;

> analyzing, by the one or more processors, one or more data structures associated with the organizational data to generate one or more rules associated with access rights for the organizational data and the third-party application data, wherein the one or more rules determine how the organizational data and the third-party application data is accessed and modified;

> analyzing, by the one or more processors, the third-party application data based on the one or more rules and the one or more data structures associated with the organizational data, wherein at least one of the data structures is an object graph data structure comprising a plurality of entities associated with the organizational data, and wherein the organizational data includes organizational structure data and the organizational structure data indicates that a first group of employees has a certain set of permissions relative to a particular group of devices;

> processing, by the one or more processors, the third-party application data based on integration information for integrating the third-party application and the organizational structure data; and

> performing, by the one or more processors, one or more operations associated with the organizational data based on processing the third-party application data.

37.     Runlayer has directly infringed, continues to infringe, and has induced or contributed to the infringement of at least claim 1 of the '940 patent by making, using, selling, and offering for sale, without authority or license, its Runlayer platform. Runlayer is liable for direct infringement, either literally or under the doctrine of equivalents, of the '940 patent pursuant to 35 U.S.C. § 271(a). All steps of at least claim 1 are performed by or attributable to Runlayer. On information and belief, to the extent that Runlayer does not perform any step of the '940 patent,

14

Runlayer directs or controls the performance of its customers' actions through contractual relations or agency principles. On information and belief, Runlayer conditions its customers' participation and benefit of its platform upon performance of one or more claim elements, and establishes the manner of such performance.

38. Runlayer also actively, knowingly, and intentionally induces infringement of at least claim 1 of the '940 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the Runlayer platform or components of that platform, such as by providing extensive documentation to encourage Runlayer's adoption, *see generally* Exhibit 8, and by publicly promoting and advertises its platform, on its website, on LinkedIn, and elsewhere. *See* Exhibits 9–10.

39. Runlayer further contributes to the infringement of at least claim 1 of the '940 patent under 35 U.S.C. § 271(c) by offering to sell and selling components of the Runlayer platform, or a material or apparatus for use in practicing a process claimed in the '940 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '940 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

40. On information and belief, and based on Runlayer's public documentation, Runlayer meets each and every limitation of the '940 patent's claim 1. *See* Exhibit 3.

41. It is also expected that discovery will likely reveal additional evidentiary support that Runlayer performs at least the above limitations of the '940 patent.

42. On information and belief, and at least as of August 9, 2026, Runlayer has known or should have known (i) about the '940 patent, (ii) that Runlayer's actions constituted and

continue to constitute infringement of the '940 patent, and (iii) that all claims of the '940 patent are valid and enforceable. *See* Exhibit 11, Aug. 9, 2026 Notice Email to Runlayer.

43. Runlayer cannot reasonably or subjectively believe that its actions do not constitute infringement of the '940 patent. Nor could Runlayer reasonably or subjectively believe that any claims are invalid. Despite that knowledge and subjective belief, Runlayer's actions are egregious and beyond typical infringement. Runlayer thus willfully infringes the '940 patent.

44. By its actions, Runlayer's infringement of the '940 patent has irreparably harmed Rippling. Unless Runlayer's infringing acts are enjoined by this Court, Rippling will continue to suffer additional irreparable injury. Rippling has no adequate remedy at law.

45. By its actions, Runlayer's infringement of the '940 patent has damaged, and continues to damage, Rippling in an amount yet to be determined, of at least a reasonable royalty and/or lost profits that Rippling would have made but for Runlayer's infringing acts.

**COUNT III**

**INFRINGEMENT OF U.S. PATENT NO. 11,789,941**

46. Rippling realleges and incorporates by references Paragraphs 1–45 above, as if fully set forth herein.

47. Claim 1 of the '941 patent recites:

1. A computer system that implements an organizational management platform that controls and leverages organizational data to manage organizational applications for an organization, the computer system comprising:

    one or more processors;

    one or more databases that collectively store a set of organizational data associated with the organization, wherein the set of organizational data comprises an object graph data structure comprising a plurality of employee data objects that respectively, correspond to a plurality of employees of the organization; and

one or more non-transitory computer-readable media that collectively store instructions that, when executed by the one or more processors, cause the computer system to perform operations, the operations comprising:

maintaining a trigger associated with an application, the trigger comprising a set of one or more conditions for activation of the trigger, the one or more conditions comprising a query expression, the trigger further comprising a set of one or more operations for execution based on the activation of the trigger, and the operations being based on a custom query language supported by the application;

evaluating the set of one or more conditions associated with the trigger based on an occurrence of an event associated with the application, wherein evaluating the set of one or more conditions involves traversing the object graph data structure to return a data object of the organizational data as a response to the query expression, wherein the organizational data includes organizational structure data defining organizational relationships between one or more data objects in the object graph data structure, wherein the one or more data objects includes the data object, and wherein traversing the object graph data structure includes using the organizational relationships to traverse the object graph data structure;

determining that the set of one or more conditions associated with the trigger is satisfied based on the evaluating;

determining whether approval is required for activation of the trigger;

obtaining, if approval is required for activation of the trigger, an approval for activating the trigger;

activating the trigger in response to obtaining the approval; and

executing the set of one or more operations associated with the custom query language based on the activation of the trigger, the set of one or more operations being performed based at least in part on the organizational data associated with the application.

48. Runlayer has directly infringed, continues to infringe, and has induced or contributed to the infringement of at least claim 1 of the '941 patent by making, using, selling, and offering for sale, without authority or license, its Runlayer platform. Runlayer is liable for direct infringement, either literally or under the doctrine of equivalents, of the '941 patent pursuant to 35

U.S.C. § 271(a). All steps performed by the computer system of at least claim 1 are performed by or attributable to Runlayer. On information and belief, to the extent that Runlayer does not perform any step of the '941 patent, Runlayer directs or controls the performance of its customers' actions through contractual relations or agency principles. On information and belief, Runlayer conditions its customers' participation and benefit of its platform upon performance of one or more claim elements, and establishes the manner of such performance.

49.    Runlayer also actively, knowingly, and intentionally induces infringement of at least claim 1 of the '941 patent under 35 U.S.C. § 271(b) by actively encouraging others to make, use, sell, and offer to sell in the United States, the Runlayer platform or components of that platform, such as by providing extensive documentation to encourage Runlayer's adoption, *see generally* Exhibit 8, and by publicly promoting and advertises its platform, on its website, on LinkedIn, and elsewhere. *See* Exhibits 9–10.

50.    Runlayer further contributes to the infringement of at least claim 1 of the '941 patent under 35 U.S.C. § 271(c) by offering to sell and selling components of the Runlayer platform, or a material or apparatus for use in practicing a process claimed in the '941 patent, that constitutes a material part of the inventions, knowing the same to be especially made or especially adapted for use in an infringement of the '941 patent, and is not a staple article or commodity of commerce suitable for substantial noninfringing use.

51.    On information and belief, and based on Runlayer's public documentation, Runlayer meets each and every limitation of the '941 patent's claim 1. *See* Exhibit 4.

52.    It is also expected that discovery will likely reveal additional evidentiary support that Runlayer performs at least the above limitations of the '941 patent.

53.     On information and belief, and at least as of August 9, 2026, Runlayer has known or should have known (i) about the '941 patent, (ii) that Runlayer's actions constituted and continue to constitute infringement of the '941 patent, and (iii) that all claims of the '941 patent are valid and enforceable. *See* Exhibit 11, Aug. 9, 2026 Notice Email to Runlayer.

54.     Runlayer cannot reasonably or subjectively believe that its actions do not constitute infringement of the '941 patent. Nor could Runlayer reasonably or subjectively believe that any claims are invalid. Despite that knowledge and subjective belief, Runlayer's actions are egregious and beyond typical infringement. Runlayer thus willfully infringes the '941 patent.

55.     By its actions, Runlayer's infringement of the '941 patent has irreparably harmed Rippling. Unless Runlayer's infringing acts are enjoined by this Court, Rippling will continue to suffer additional irreparable injury. Rippling has no adequate remedy at law.

56.     By its actions, Runlayer's infringement of the '941 patent has damaged, and continues to damage, Rippling in an amount yet to be determined, of at least a reasonable royalty and/or lost profits that Rippling would have made but for Runlayer's infringing acts.

## JURY DEMAND

57.     Rippling demands trial by jury on all claims and issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Rippling prays that this Court enter judgment in its favor against Runlayer as follows:

(a)     That one or more claims of the '994 patent has been infringed by Runlayer;

(b)     That Runlayer's infringement of the '994 patent has been willful;

(c)     That one or more claims of the '940 patent has been infringed by Runlayer;

(d)     That Runlayer's infringement of the '940 patent has been willful;

(e)     That one or more claims of the '941 patent has been infringed by Runlayer;

19

(f)    That Runlayer's infringement of the '941 patent has been willful;

(g)    An award of damages adequate to compensate Runlayer for the patent infringements that have occurred, together with pre-judgment interest and costs;

(h)    An accounting for acts of infringement not presented at trial and/or up to the judgment and an award by the Court of additional damage for any such acts of infringement;

(i)    A preliminary and permanent injunction against Runlayer from further infringement, or alternatively, an award of an ongoing royalty for Runlayer's post-verdict infringement, payable on each product or service offered by Runlayer that is found to infringe one or more of the patents asserted herein, and on all future products and services that are not colorably different from those found to infringe;

(j)    An award of all other damages permitted by 35 U.S.C. § 284, including increased damages up to three times the amount of compensatory damages found;

(k)    A finding that this is an exceptional case and an award to Rippling of costs and reasonable attorneys' fees incurred in this action as provided by 35 U.S.C. § 285; and

(l)    Such other relief, including other monetary and equitable relief, as this Court deems just and proper.

Dated: August 10, 2026

*Of Counsel:*

Daniel S. Block
Michael D. Specht
Jonathan Tuminaro
STERNE, KESSLER, GOLDSTEIN & FOX,
P.L.L.C.
1101 K Street, N.W.
10th Floor
Washington, D.C. 20005
Telephone: (202) 371-2600
dblock@sternekessler.com
mspecht@sternekessler.com
jtuminar@sternekessler.com

Respectfully submitted,

By: /s/ *Adam W. Poff*
Adam W. Poff (No. 3990)
Robert M. Vrana (No. 5666)
Parks L. Kingery (No. 7416)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com
rvrana@ycst.com
pkingery@ycst.com

*Attorneys for People Center, Inc., d/b/a
Rippling*

21